**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Earl FLEMING, Jr., Henry Lee
Fleming and Tommie Earl Millender,
Defendants-Appellants.**

Nos. 76–2278 to 76–2280.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1977.

Decided Feb. 13, 1979.

Certiorari Denied June 11, 1979.
See 99 S.Ct. 2863.

Robert A. Filpi, Chicago, Ill., H. Gary Apoian, East St. Louis, Ill., for defendants-appellants.

Walter E. Schroeder, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and KUNZIG, Judge.*

FAIRCHILD, Chief Judge.

Appellants James Earl Fleming, Jr., Tommie Millender, and Henry Fleming were charged in a three-count indictment with assaulting the employees of a bank during the course of a bank robbery in violation of 18 U.S.C. § 2113(d),[1] killing a person while avoiding and attempting to avoid apprehension from the robbery in violation of 18 U.S.C. § 2113(e),[2] conspiracy to rob a bank in violation of 18 U.S.C. § 371,[3] and commission of that offense in violation of 18 U.S.C. § 2113(a).[4] Robert Fisher, Jr. was also charged with these offenses but was deceased prior to the time of the indictment.

After a three-day trial involving testimony by over 40 witnesses, the jury found the defendants guilty on all three counts. The defendants received identical sentences of 25 years for the robbery, 200 years for the

---

* The Honorable Robert L. Kunzig, Judge of the United States Court of Claims, is sitting by designation.

1. 18 U.S.C. § 2113(d) provides:

   (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

2. 18 U.S.C. § 2113(e) provides:

   (e) Whoever, in committing any offense defined in this section or in avoiding or attempting to avoid apprehension for the commission of such offense, . . . kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

3. 18 U.S.C. § 371 provides in relevant part:

   If two or more persons conspire either to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

4. 18 U.S.C. § 2113(a) provides in relevant part:

   (a) Whoever, by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another any property or money, . . . or in the care, . . . or possession of, any bank, or any savings and loan association—

   Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

killing,[5] and five years for the conspiracy. The sentences were to run consecutively to one another and to any and all sentences previously imposed. Each defendant appeals his conviction.

## I. BACKGROUND

On the morning of July 9, 1973, several witnesses observed a cream and brown Ford LTD occupied by four black males driving through Elkville, Illinois, and De Soto on the way to Carbondale, Illinois.

At 11:30 a. m., Larry Powell, a Carbondale resident, was flagged down by four black males who said they locked the car keys in the trunk and needed tools to retrieve them. The car was a cream and brown LTD, later identified by Powell and other witnesses at FBI request.

At approximately 1:15 p. m. on July 9, several black males robbed the Elkville State Bank in Elkville, Illinois, escaping with $11,355.10, packaged in St. Louis Federal Reserve Bank wrappers. Several witnesses testified to the presence of a green Chevrolet Nova outside the bank at this time and to observing several black men get into the Nova. The car then left the bank area quickly.

At a later time on July 9, a green Chevrolet Nova was seen occupied by a white woman, later identified as Colleen Battaglia, the murder victim, and a black man. A second car occupied by several other black males was observed following the Nova. Even later on the afternoon of July 9, a green Chevrolet Nova was found in the Carbondale dump. The trunk was partially pried open by police and in it was found the nude and bound body of Colleen Battaglia. The back seat of the car contained various pieces of clothing and a purse. The Nova belonged to the murder victim and her husband, Michael Battaglia.

Police investigators took soil samples from the vicinity of the Chevrolet Nova. A rope was also found on the road by the dump. Two bullets were subsequently dis-covered in the trunk. Michael Battaglia testified that he had a navy blue stocking cap in the trunk of the green Chevrolet Nova which was not present when the car was returned by the police.

An autopsy performed on Colleen Battaglia revealed that she died from hemorrhaging caused by several close range gunshot wounds in the neck and chest. The pathologist who performed the autopsy could not determine the time of death. The rope which bound the victim's hands was preserved for evidence.

On July 11, 1973, Carbondale police received a radio message from the FBI seeking assistance in stopping an evasive vehicle. In response to that call, the Ford LTD, driven by Leon Collins, was stopped. The license plates on the LTD were registered to James Fleming for a 1972 Oldsmobile Cutlass. The LTD was apparently stolen. That same day the Ford LTD was examined. Investigators removed a dark blue stocking cap, some vacuum sweepings, a rug, and assorted other items. Laboratory analysis revealed that the rug found in the LTD contained sisal fibers which were identical to the rope removed from Colleen Battaglia and the rope found at the dump where the green Chevrolet Nova was located. The blue stocking cap found in the LTD matched the description of the cap missing from the green Chevrolet Nova. Moreover, soil samples taken from the cap matched the soil found around the Chevrolet at the dump. The FBI was unable to establish that Negroid hair fragments found in the green Chevrolet Nova came from any of the defendants.

On October 22, 1973, the decomposed body of Robert Fisher was found by the police. The body was clothed in purple pants similar to those worn by one of the four men who flagged Larry Powell down on the day of the robbery.

At trial a bank teller, Mrs. Nellie Jean Cochran, identified James Earl Fleming, Jr.

---

**5.** This court is inclined to disfavor sentences for a fixed number of years which are wholly unrealistic and truly beyond the power or discretion of the sentencing court. No one raised any objection on this ground and we do not deal with it.

and Henry Fleming as participants in the robbery. Mrs. Cochran had earlier identified Henry Fleming from a series of photographs. Mrs. Cochran was unable, however, to identify positively James Earl Fleming, Jr. from a line-up immediately after the bank robbery. Powell was also able to provide a detailed description of the four men.

The Carbondale Police Chief testified that on July 26, 1973, Leon Collins, the Carbondale resident at whose home James Earl Fleming lived at the time of the robbery, contacted the Police Department and indicated that he had found a money wrapper in a cosmetic case which James Earl Fleming had left during his stay. The money wrapper was from the St. Louis Federal Reserve Bank, dated May 3, 1973.

All defendants allegedly made statements connecting them with the events of July 9, 1973. The first government witness, Gerald Smith, testified that James Earl Fleming told him the details of the Elkville robbery and the murder of Colleen Battaglia. Fleming allegedly implicated himself, his brother, and a person nicknamed "Fish." Fleming also allegedly confessed to killing "Fish" because he was a drug addict and, therefore, unreliable.

Another government witness, Otis Philips, testified that Henry Fleming told him of the Elkville Bank robbery in November, 1973. Allegedly Henry Fleming stated that he, his brother, James, and Fisher took $10,-000 in the robbery and used some of the money as bond for a brother-in-law. Additionally, Fleming related that a teller was taken hostage, raped, and murdered. James Earl Fleming allegedly confirmed his brother's story. Philips then testified that the Fleming brothers threatened to kill him if he ever disclosed their involvement in the Elkville robbery.

Still another government witness, John Flournoy, testified that in June, 1973, he, James Earl Fleming and Tommie Millender were discussing possible bank targets in the Carbondale area. A similar discussion was held later that month in East St. Louis, Illinois at Millender's house in the presence of Flournoy, James Fleming, Millender, and "Fish." On that occasion, Millender allegedly told Flournoy in confidence that "Fish" was dispensable after the robbery. Flournoy did not participate in the Elkville Bank robbery because he was in the county jail on July 9th. In January or February, 1974, Flournoy again allegedly conversed with James Fleming regarding the Elkville robbery. At this meeting, Fleming recounted the bank robbery, abduction, and murders of Colleen Battaglia and Robert Fisher.

The final incriminating statement was made by Tommie Millender in the presence of Frank Reid and Fred Meyer, both United States Marshals. After having been given a copy of the indictment after his arrest, Millender allegedly stated "whoever told them all this had to be somebody that was there, because they knew exactly how it took place." In addition to testimony regarding the out of court statements by defendants and identification of defendants, several photographs of the car and the nude body of the victim were introduced at trial over defendants' objection.

At the conclusion of the trial, two female jurors were approached by a black male later identified as the brother of Tommie Millender. The jurors were reportedly asked how they were going to vote and later noticed that they were being followed by a car occupied by black individuals. The two female jurors became frightened, and related the incident to three male jurors upon their return. When informed of the incident, James Earl Fleming moved for a mistrial. The motion for a mistrial was denied after the jurors stated they could still deliberate fairly and impartially.

Although in closing argument defendants' counsel argued that statements of the government's witnesses were unreliable because they were made by convicted felons and that other evidence was ambiguous, the jury, after weighing the evidence and determining the credibility of the witnesses, entered guilty verdicts on all counts.

Defendants contend on appeal that: (1) they were denied their Sixth Amendment

right of confrontation by the admission into evidence of confessions by co-defendants who did not testify; (2) the trial court erred in failing to instruct the jury on the use of co-defendants' confessions and in failing to instruct the jury that the identity of the perpetrators of the crimes must be proved beyond a reasonable doubt; (3) they were denied effective assistance of counsel; (4) the court abused its discretion in admitting into evidence several photographs of the murder victim; (5) the court erred in refusing to grant a mistrial after the two jurors were confronted before deliberation; (6) the killing of Colleen Battaglia does not establish a violation of 18 U.S.C. § 2113(e); and (7) the court erred in imposing consecutive sentences for violations of § 2113(d) and § 2113(e). We will now consider each of these contentions.

## II. *THE CONFRONTATION CLAUSE CLAIM*

All three defendants made statements which not only implicated themselves, but also other defendants. The court allowed the introduction of these extrajudicial hearsay statements into evidence against all defendants over objection that such admission contravened the dictates of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We now turn to an examination of *Bruton* and its progeny to determine the admissibility and prejudicial impact of the statements of the defendants in this case.

In *Bruton*, the Supreme Court held that in a joint trial of two defendants, a confession of one co-defendant who did not testify could not be admitted into evidence even with a limiting instruction that the confession could only be used against the confessing defendant. The rationale of *Bruton* was that the introduction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment.

The government claims the present case differs from *Bruton*, however, in that each of the defendants made admissions which are substantially similar to the hearsay declarations of the other defendants. The government asserts that under these circumstances where the admissions by the co-defendants "interlock," introduction of admissions by non-testifying co-defendants does not violate the *Bruton* rule. A line of cases in the Second Circuit has held that *Bruton* is inapplicable where confessions by defendants in a joint trial interlock. *E. g., United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45 (2d Cir. 1975); *United States ex rel. Ortiz v. Fritz*, 476 F.2d 37 (2d Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973); *United States ex rel. Catanzaro v. Mancusi*, 404 F.2d 296 (2d Cir. 1976).[6] The defendants, on the other hand,

---

**6.** The Second Circuit's formulation of the interlocking co-confession exception does not require absolute identity of statements, *United States ex rel. Ortiz v. Fritz*, 476 F.2d 37 (2d Cir. 1973). It is sufficient if the two confessions are substantially the same and consistent on the major elements of the crime involved. *U.S. ex rel. Duff v. Zelker*, 452 F.2d 1009 (2d Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134 (1972). In *Duff*, petitioner confessed to riding with his co-defendants to the scene of the crime. However, he claimed that he walked away from the liquor store where the crime was to take place. His co-defendant stated in his confession that Duff walked toward the liquor store. The court did not find such discrepancy in confessions to be significant where the confessions were essentially the same facts and were similar to the statements of the co-defendants. Duff's own confessions placed him at the scene with a fair implication of cunning participation. 452 F.2d at 1010. In *Ortiz*, the confessions at issue not only covered different aspects of the crime, but were directly contradictory as to the time of its commission. Yet, there the court concluded that:

"Although the three confessions do not all cover the same facts, they do interlock and are consistent as regards the slaying. As to the time of commission, there is a considerable discrepancy. . . . This means that one or more of the confessions is false or erroneous. But we do not think it takes away from the 'interlocking' aspect of the confessions. As to motive, plot and execution of the crime they are essentially the same." 476 F.2d at 39.

Thus, it appears that under this exception, the court must look to the substance of the confessions to see whether they interlock sufficiently

contend that there is no "interlocking co-confession" exception to *Bruton* and therefore the admissions of the co-defendants were improperly admitted and must be tested under the harmless error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[7] This view is supported by several circuits which have rejected any exception to *Bruton* when co-confessions interlock and have evaluated the admission of such evidence under the harmless error rule. *E. g., Randolph v. Parker*, 575 F.2d 1178 (6th Cir. 1976), *cert. granted*, —— U.S. ——, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978); *Hall v. Wolff*, 539 F.2d 1146 (8th Cir. 1976); *United States v. Digilio*, 538 F.2d 972 (3d Cir.), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749.

The leading case in this circuit, upon which both parties rely, is *United States v. Spinks*, 470 F.2d 64 (7th Cir.), *cert. denied*, 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972). In *Spinks*, this court held that, at least to the extent of the facts presented there, the admission of substantially similar confessions by two co-defendants did not violate *Bruton*, thus following the Second Circuit's view. This court also stated, however, that "if error was committed it was harmless beyond a reasonable doubt," 470 F.2d at 66, given the objecting defendant's own confession and other evidence of his guilt.

This court's reliance on both the interlocking co-confession exception and the harmless error rule is not incompatible. If, as in *Bruton*, only one of two co-defendants makes an inculpatory statement, then by admitting such statement into evidence without affording the objecting defendant the opportunity to test the statement by cross-examination the trial court will run the risk that the jury will be unable to disregard the co-defendant's potentially unreliable confession and thus deprive him of the Sixth Amendment right of confrontation. *Bruton, supra* 391 U.S. at 136, 88 S.Ct. 1620. The same situation exists where co-defendants make inculpatory statements which are contradictory. The jury may look to the unreliable incriminating statements of a co-defendant, or to the cumulative impact of those statements coupled with the objecting defendant's own statement to find defendant's guilt. This danger is particularly great where, as is often the case, the defendant denies making the confession or admission admitted against him. In this type of case, the defendant's defense that he did not make a statement attributed to him is undermined by the admission of a confession of non-testifying co-defendant.[8] Where, however, such inculpatory statements are admitted in evidence, additional corroborating evidence may make the error harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

When, as in *Spinks*, the incriminating statements are substantially similar, then the devastating risk that the jury will be unable to disregard the co-defendant's statement is not present because the defendant's own similar statement is in evidence. Where the statement is not repudiated, it may be powerful evidence of guilt, and if properly admissible, may render the existence of the co-defendant's statement harmless beyond a reasonable doubt. Thus,

---

on vital points to indicate a common genesis. If they do, "devastating" effects anticipated by *Bruton* do not follow from such admission. *U. S. ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 48–49 (2d Cir. 1975). The view of the Second Circuit has the advantage of upholding convictions where the defendant has confessed to the crime. As there is probably no more inculpating or damaging evidence of a defendant's guilt than his own confession, the temptation to uphold convictions where such confessions were indisputably properly admitted into evidence is apparent.

**7.** The Supreme ·Court has repeatedly recognized that violations of *Bruton* can be harmless error. *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

**8.** We note that the Second Circuit, itself, has questioned the soundness of the interlocking co-confessions exception to *Bruton*, but has felt bound by its prior precedents. *See Ortiz, supra* at 40.

we must review the inculpatory statements to see if they were substantially similar on critical points to indicate a common origin and to minimize the problems dealt with by *Bruton.*

This case differs from *Spinks* in that there are no formal confessions here, only informal disclosures in conversations with acquaintances and cellmates under circumstances which raise questions of credibility. But, as in *Bruton* and *Spinks*, none of the defendants took the stand and no repudiation of the statements was made.

■ Here, two of the three defendants, James and Henry Fleming, admitted in detail the circumstances surrounding the commission of the crimes to others. The statements made to Smith, Philips, and Flournoy by the Fleming brothers interlock closely. Each described the taking of a white woman hostage in order to obtain a getaway car, the bank robbery itself, the killing of the hostage, and the killing of accomplice Fisher. While the admissions were not absolutely identical and some of the descriptive details were garbled in the retelling, there is no doubt that the same crimes were described by both Flemings. Thus, with regard to the Flemings the use of extrajudicial admissions of one against the other would not bring about the devastating effects envisioned by *Bruton.* We can see no prejudice to either Fleming since each would still be faced with his own admission even if the other's admission was excluded.

The evidence against James Earl Fleming amply supported his conviction. John Flournoy and Gerald Smith both testified that James Earl Fleming admitted to them his participation in the robbery of Elkville State Bank and the murders of Colleen Battaglia and Robert Fisher. Flournoy also testified that he, James Earl Fleming and Tommie Millender conspired to rob a bank. Otis Philips further testified that Fleming threatened to kill him if he testified. All this testimony was clearly admissible against James Earl Fleming. Moreover, Fleming was identified in court, as seen near the bank by Larry Powell, and by Mrs. Cochran as being one of the robbers.

In addition, considerable circumstantial evidence supported James Earl Fleming's conviction. A rope sample found in the LTD matched the rope which bound the hands of the murder victim and the rope found near the green Chevrolet Nova in the dump. A blue stocking cap matching the description of one missing from the green Chevrolet Nova owned by the Battaglias was found in Fleming's car. Finally, the Carbondale Police Chief testified that Leon Collins contacted the Carbondale Police Department after he allegedly found a money wrapper from the St. Louis Federal Reserve Bank in a cosmetic case owned by James Earl Fleming.[9]

Given the overwhelming evidence of the guilt of James Earl Fleming, we have no difficulty finding that the improperly admitted evidence was harmless error.

The case against Henry Fleming essentially consists of his own admissions, identification by an eyewitness to the robbery, and some circumstantial evidence. Otis Philips testified that Henry Fleming told him that he had robbed the Elkville State Bank and also committed a rape and a murder. Philips also testified that Henry Fleming threatened to kill him if he testified at trial. Finally, Philips stated that Henry Fleming told him that some of the robbery money was used to bail out Ken Bevner, Henry Fleming's brother-in-law. Sergeant Bill Glassaock testified that on the day after the robbery, Henry Fleming did pay $750 to have Bevner released on bail. The testimony of Otis Philips and Sergeant Glassaock was unquestionably admissible against Henry Fleming.

Henry Fleming was further inculpated by the testimony of Mrs. Cochran, who identified Henry Fleming both after the robbery from a series of photographs and at trial as a participant in the bank robbery. Thus Mrs. Cochran identified Henry Fleming on two different occasions as one of the bank robbers.

---

**9.** This testimony of the Carbondale Police Chief was clearly hearsay. However, as several of the defendants concede in their briefs, no objection was made.

As in the case of James Earl Fleming, we find that the evidence against Henry Fleming strongly supports his conviction. The improperly admitted evidence was merely cumulative and therefore constituted harmless error.

Millender's statement regarding the crimes is not substantially similar to those of the Flemings. In fact, the statement consists of one noncommittal sentence made in the presence of two federal marshals on being shown the indictment against him. The government contends that the sentence —"I'll tell you one thing, whoever told them all this had to be somebody that was there, because they knew exactly how it took place." is as inculpatory as the clear and unequivocal admissions of the Flemings. We disagree. Millender's comment is of such general nature that it is not certain whether the statement was an admission or merely a reaction to the detailed nature of the document presented to him. Consequently, in Millender's case, the use of the extrajudicial admissions of his co-defendants could bring about the devastating effect feared by *Bruton*. It is possible that a seemingly inconsequential statement by Millender could be interpreted by the jury to be an admission of guilt when coupled with the detailed admissions of his co-defendants. Thus we conclude that the use of the inculpatory statements of the Fleming brothers was erroneous. We must, however, scrutinize all evidence against Millender to determine whether or not the error is harmless beyond a reasonable doubt.

The evidence against Tommie Millender consisted of statements which he allegedly made to John Flournoy and to the United States Marshals. Flournoy testified to conversations he had with Millender where a bank robbery and the possible murder of Robert Fisher was discussed. These statements were admissible against Millender since he and Flournoy were co-conspirators and the testimony shows participation in a conspiracy to rob.[10] Of course, the statement made to the marshals was also admissible against Millender.

Millender's statements to Flournoy are powerful evidence of guilt. The statement made in the presence of the marshals is less indicative of guilt, but may be damaging since their credibility was not attacked. However, unlike the case against either James Earl or Henry Fleming, no other direct or circumstantial evidence linked Millender to the crime. Significantly, Millender was never identified before, during, or after the robbery as a participant. Under these circumstances, we cannot say that the improperly admitted admissions of James Earl and Henry Fleming which linked Millender to the crime were not prejudicial beyond a reasonable doubt and therefore hold that Millender is entitled to a new trial.

## III. *THE ABSENCE OF LIMITING INSTRUCTIONS*

Even though the argument about the absence of limiting instructions is to some extent merged with the *Bruton* argument, defendants contend that the failure of the trial court to give limiting instructions on the use of the hearsay evidence and the burden of proof in proving identity constitutes reversible error. At trial, no defendant at any time requested a limiting instruction as to any statements of co-defendants nor did any defendant ask for an identification instruction. Thus the failure to instruct must result in "basic and highly prejudicial error" to justify reversal of a conviction. *United States v. Esquer*, 459 F.2d 431 (7th Cir. 1972), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973).

---

**10.** Millender contends that this testimony was inadmissible as it consisted of statements made by James Earl Fleming to Flournoy. The transcript clearly indicates, however, that Flournoy testified about conversations with Tommie Millender as well as James Earl Fleming. Under the *Federal Rules of Evidence*, such statements of a co-conspirator are not even classified as hearsay. *Fed.R.Evid.* 801(d)(2)(E). Moreover, since Flournoy testified at trial, Millender was not denied any right of confrontation.

A. *The Failure to Give Limiting Instructions On the Use of the Hearsay Statements*

■ We do not find the failure of the trial judge to give a limiting instruction at the time the statements were introduced to be sufficiently prejudicial to constitute plain error. *Riley, et al. v. United States*, 411 F.2d 1146 (9th Cir. 1969), *cert. denied*, 397 U.S. 906, 90 S.Ct. 897, 25 L.Ed.2d 87 (1970). It is conceivable that the defense attorneys did not request such an instruction as a matter of strategy to avoid highlighting damaging statements to the jury. Moreover, the conspiracy instruction given by the judge at the end of the trial specifically informed the jurors that they could consider statements not in furtherance of the conspiracy only against the person making them.

Defendants rely on *United States v. McClain*, 142 U.S.App.D.C. 213, 440 F.2d 241 (1971), for the proposition that failure by the trial judge to give a limiting instruction at the time of the admission of evidence offered for a limited purpose constitutes plain error. *McClain*, however, is distinguishable from the case at bar. The issue in *McClain* was the evidentiary use of a prior violent act by the defendant in a later trial which resulted in a conviction for manslaughter. While the prior act was admissible against the defendant to show malice, no limiting instruction was requested or given. The court held that the failure of the trial judge to issue a limiting instruction was plain error requiring reversal.

*McClain* involved unique facts which are crucial to an understanding of the case. After defense counsel in *McClain* objected to the admission of the prior incident, the prosecutor stated at the bench that he only intended to use the incident to demonstrate malice. The trial court excluded the evidence as prejudicial. When defense counsel then questioned the witness about prior violent acts by defendant, the court on its own initiative interrogated the witness about the specific prior incident that the court had earlier excluded as too prejudicial. Under these circumstances, the absence of a limiting instruction was deemed to be plain and reversible error.[11] As the unusual facts of *McClain* are absent in this case, we adhere to the general rule that "[T]he primary responsibility rests on counsel to make fair and proper requests to charge." *United States v. Bessesen*, 445 F.2d 463, 468 (7th Cir. 1971). We hold, therefore, that the failure of the trial court to give limiting instructions on the use of hearsay statements at the time of their admission does not constitute plain error mandating reversal.

B. *The Failure to Give Limiting Instructions on the Burden of Proof in Proving Identity*

■ Defendants also contend that where identification of a defendant is a key issue, failure to given an instruction on identity constitutes reversible error. We find no merit to this contention. Some cases cited by defendants do hold that refusal to give a proffered instruction on the issue of identity is reversible error. *E. g., United States v. Hodges*, 515 F.2d 650 (7th Cir. 1975). *Cf., United States v. Barber*, 442 F.2d 517 (3d Cir. 1971). These cases do not suggest, however, that a failure by the trial judge to give a cautionary instruction to the jury where none was requested can be grounds for reversal.

IV. *THE ADEQUACY OF COUNSEL*

Criminal defendants in this circuit have "the constitutional right to an advocate whose performance meets a minimum professional standard." *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975). The defendants here claim their counsel did not meet this constitutionally required minimum standard.

In considering a claim of ineffective assistance of counsel

11. Subsequent cases have limited the potentially broad implications of *McClain* by focusing on the unique facts of the case. *See, e. g.,*

*United States v. Lee*, 166 U.S.App.D.C. 67, 509 F.2d 400 (1974); *United States v. Bobbitt*, 146 U.S.App.D.C. 224, 450 F.2d 685 (1971).

we start with a presumption that he was conscious of his duties to his clients and that he sought conscientiously to discharge those duties. The burden of demonstrating the contrary is on his former clients.

*Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975). *See also, United States ex rel. Ortiz v. Sielaff*, 542 F.2d 377 (7th Cir. 1976). We do not feel defendants have succeeded in overcoming the presumption of adequate assistance of counsel.

Defendants place primary emphasis on trial counsel's failure to request limiting instructions on the use of statements by co-defendants at the time of their admission and trial counsel's failure to request an instruction on identification. Defendants also allege that trial counsel should have moved to suppress the eyewitness identification of Henry Fleming by Mrs. Cochran and should have objected to the introduction of certain hearsay testimony.[12]

██ None of these alleged failures by counsel rise to the level of a constitutional deprivation. As we stated earlier, defense counsel may well have decided not to draw the attention of the jury to damaging testimony by requesting limiting instructions at the time of admission. Nor do we consider the failure to move to suppress the identification of defendants as significant given the extreme unlikelihood that such motion would be granted.[13] We concede that it may have been preferable for counsel to have requested an instruction on identification and objected to the introduction of all hearsay evidence, but we adhere to the view that tactical or strategic errors during

trial do not raise a presumption of failure to meet the constitutional guarantee of adequate counsel. *United States ex rel. Williams v. Twomey, supra* at 640. Were the situation otherwise, there would rarely be a criminal trial where some strategic or tactical error could not be seized upon as demonstrating ineffective assistance of counsel. Finally, we note that we are persuaded, after an independent examination of the record, that defense counsel did a commendable job in attempting to discredit testimony of government witnesses, objecting to the introduction of statements of non-testifying co-defendants as violative of *Bruton*, making other timely objections, and presenting the evidence in a light most favorable to defendants in opening and closing arguments.[14]

## V. THE INTRODUCTION INTO EVIDENCE OF THE PHOTOGRAPHIC EXHIBITS

██ Defendants assert that the admission into evidence of numerous photographs of the victim's nude and bound body prejudiced the jury against the defendants and constituted reversible error. It is well settled that the admission or rejection of photographs lies largely within the discretion of the trial court, and unless there is a showing of abuse of discretion, the trial court's ruling will not be disturbed on appeal. *United States v. Delay*, 500 F.2d 1360, 1366 (8th Cir. 1974). Although relevant evidence can at times be excluded where highly prejudicial, in this case, several of the photographs had probative value in that they established the *corpus delicti*,

12. Defendants correctly point to the hearsay testimony of the Carbondale Police Chief detailing how Leon Collins found a money wrapper in the possession of James Earl Fleming as evidence which would have been excluded had proper objection been made. *See* footnote 8, *supra*.

13. Appellant Henry Fleming concedes that "in a normal case it is not improper for an attorney to fail to move to suppress an identification of his client." Brief at 34.

14. *United States ex rel. Williams v. Twomey, supra*, relied upon by defendants is distinguishable. In *Twomey*, this court held that a defend-

ant was denied effective assistance of counsel where an inexperienced lawyer was appointed the day of the trial and failed to ask for a continuance to determine a co-defendant was willing to testify and to attempt to locate and identify four individuals whose first names were known to the defendant. Moreover, the trial counsel did not consider the risk that defendant's criminal record could be introduced against defendant if he took the stand in his own defense. We do not view the conduct of counsel in this case as even remotely approaching the *Twomey* situation.

the approximate location of the gunshot wounds, and the fact that the victim's hands were bound with rope. Arguably a smaller selection of pictures could have sufficed. While the United States should be cautious to avoid unnecessary prejudice, it is a matter of discretion and we cannot say it was abused.

## VI. THE REFUSAL TO DECLARE A MISTRIAL

Defendants further allege that the trial court abused its discretion in failing to declare a mistrial after two female jurors were contacted and questioned as to how they would vote.

In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1953), the Supreme Court held that unauthorized private communications with jurors on matters pending for their deliberation was presumptively prejudicial.

■ We think the presumption of prejudice was overcome in this case. All counsel agreed to permit the court to question the jurors involved as to any prejudice. At a hearing in chambers, each of the jurors who was aware of the *ex parte* communication stated that he or she was not prejudiced or in any way hampered from impartially considering the charges against the defendants. Only after this hearing was conducted did the trial judge refuse to grant defendants' motion for a mistrial. We hold that the judicious course followed by the trial judge after the unfortunate communication with the jurors adequately demonstrated that no prejudice resulted and that therefore the trial court did not abuse its discretion in not declaring a mistrial.

## VII. WHETHER A VIOLATION OF 18 U.S.C. § 2113(e) WAS PROVED

18 U.S.C. § 2113(e) provides in relevant part:

15. Defendants contend that the killing of Colleen Battaglia could have just as easily occurred before the robbery but the evidence amply supports the finding that Battaglia was killed after the robbery.

Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense . . . kills any person . . . shall be imprisoned . . . . .

Defendants contend that no violation of this section was proved in this case. We do not agree.

The government alleged that defendants kidnapped Colleen Battaglia in Carbondale to acquire her car to commit the bank robbery. The defendants then robbed the Elkville State Bank and fled to the dump in Carbondale where they murdered Colleen Battaglia. The verdict of guilty demonstrates the jury agreed with the government's view of the case.

■ We are aware, of course, that criminal statutes must be construed strictly. However, we find no ambiguity in the statute. The kidnapping and murder of Colleen Battaglia after the bank robbery [15] falls plainly within the statutory prohibition of murder "in avoiding or attempting to avoid apprehension for the commission of [the] offense." *See United States v. Etheridge*, 424 F.2d 951, 963 (6th Cir. 1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 463, 27 L.Ed.2d 442 (1971).[16]

## VIII. WHETHER IT WAS PROPER TO IMPOSE CONSECUTIVE SENTENCES FOR VIOLATIONS OF 18 U.S.C. §§ 2113(d) AND 2113(e)

The question before us is whether consecutive sentences can be imposed under subsection (d) and (e) of 18 U.S.C. § 2113. Defendants contend that these subsections each prescribe a more severe punishment for the substantive offense defined elsewhere in § 2113 rather than creating separate offenses for which separate sentences may be imposed.

16. *United States v. Marx*, 485 F.2d 1179 (10th Cir. 1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974), cited by defendants, was a case where the government failed to prove a violation of § 2113(e) and is therefore inapposite.

The pertinent part of subsection (d) provides: "Whoever, *in committing* . . . *any offense defined in subsection (a)* . . . assaults any person, . . . shall be fined . . . ." (Emphasis added.) This language has been uniformly interpreted to increase the subsection (a) penalty for committing an assault during the course of a bank robbery and not to create a distinct offense authorizing a separate penalty. *United States v. Faleafine*, 492 F.2d 18 (9th Cir. 1974). *Cf. Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957).

The language of subsection (e), differs significantly from the language of subsection (d). Subsection (e) has three separate subparts stated in the disjunctive which, to facilitate analysis, we number in brackets: "Whoever [1] in committing any offense defined in this section, [2] *or* in avoiding or attempting to avoid apprehension for the commission of such offense [3] *or* in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person . . . ." (Emphasis added.)

■ Whatever the merits of arguing about the construction of § 2113(d) and (e), this circuit has long ago committed itself to the position that this § 2113(e) creates separate offenses for which separate sentences can be imposed. *United States v. Parker*, 283 F.2d 862 (7th Cir. 1960). Other circuits have reached the same result. *E. g., Crawford v. United States*, 519 F.2d 347 (4th Cir. 1975), *cert. denied* 423 U.S. 1057, 96 S.Ct. 791, 46 L.Ed.2d 647 (1976); *Clark v. United States*, 184 F.2d 952 (10th Cir. 1950). *Contra, Sullivan v. United States*, 485 F.2d 1352 (5th Cir. 1973); *Simunov v. United States*, 162 F.2d 314 (6th Cir. 1947).

Having considered all the contentions of the defendants, the judgments as to James Earl Fleming and Henry Fleming are affirmed. The judgment as to Tommie Millender is reversed, and his cause remanded for a new trial.

AFFIRMED IN PART, REVERSED IN PART.