**UNITED STATES of America, Appellee,**

v.

**Ronald SUBLET, Appellant.**

**No. 80–1698.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1981.

Decided March 25, 1981.

G. Stephen Long, Shughart, Thomson & Kilroy, A Professional Corp., Kansas City, Mo., for appellant.

Ronald S. Reed, Jr., U. S. Atty., Anthony P. Nugent, Jr., First Asst. U. S. Atty., Carol Ann Petren, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before BRIGHT, STEPHENSON and McMILLIAN, Circuit Judges.

STEPHENSON, Circuit Judge.

Defendant Ronald Sublet appeals his conviction[1] of bank robbery charges under 18 U.S.C. §§ 2, 2113(a), (d). He claims that an alleged "threat" made to a juror requires a new trial and that a lineup was conducted in violation of his Sixth Amendment right to counsel. Sublet raises two other issues concerning the lineup, challenges an aiding and abetting instruction and questions the sufficiency of the evidence. We affirm the jury conviction.

## I. BACKGROUND

Viewing the evidence in the light most favorable to the jury conviction, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we shall briefly summarize the record.

Two black men, wearing green ski masks, robbed the Laurel Bank in Kansas City, Missouri, on February 20, 1980. Just as the men entered the bank, a teller triggered a silent alarm which alerted the Kansas City police and started the bank's surveillance camera. The first robber in the bank brandished a handgun. The two escaped with approximately $16,000 in cash.

About the time that the two masked men left the bank, Officer Wilbur Wright arrived at the scene. Officer Wright, a Kansas City, Missouri, policeman, observed the two men, still wearing masks, leave the bank and enter a blue and white Oldsmobile. As they drove away Officer Wright followed. After a high speed chase of several blocks, the suspects' car skidded off the roadway and came to a stop. One of the suspects turned in the direction of Officer Wright with a revolver in his hand as he got out of the car. Officer Wright fired several shots.

The two men fled to a nearby wooded area and the policeman was unable to continue his pursuit. As the robbers ran they abandoned several items including a pair of slippers, a tennis shoe, two green ski masks,

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, presiding, sentenced the defendant to twenty-five years.

two handguns, a waste basket from the bank which had been used to carry the money and the $16,000. These items were produced at trial and, except for one of the guns, were all linked to the two men who robbed the Laurel Bank. A bank employee and Officer Wright identified the masks as the same as or very similar to the masks worn by the robbers. The slippers and tennis shoe were also described as those worn by the robbers. One of the handguns was identified by Officer Wright and a bank employee as being the same kind used by one of the robbers. The money found in that area roughly equaled the amount stolen and included "bait" money from the Laurel Bank.

The two suspects ran through the wooded area to the Holiday Apartment complex. Officers later located tracks that started at the blue and white Oldsmobile and went through the woods to the apartment complex. Apparently, the pair of robbers left clear footprints in the snow. This escape route was confirmed by witness Duane Murphy, who was in an apartment in the Holiday complex and watched through a sliding glass door.

Murphy's attention was drawn to this series of events when he heard the shots fired by Officer Wright and the sirens. Murphy saw the two men get out of the blue and white Olds and run into the woods. He lost sight of the pair for several minutes. He saw them again when they emerged from a breezeway in the apartment building across the street from Murphy's vantage point. Murphy observed the two men, now without their masks, from a distance of fifty to sixty feet. The two moved cautiously out of the breezeway, looking from side-to-side, then ran to a waiting maroon four-door Oldsmobile. They hurriedly entered the back seat; one of the men said "let's go" and then ducked down. The Oldsmobile sped away followed closely by an orange Matador automobile.

At trial Murphy positively identified one of the men as Kenneth Rayford and tentatively identified the other as Ronald Sublet, appellant in the case at bar.

The most significant evidence was provided by Diana Glover. According to her testimony, Diana was a passenger in the maroon Oldsmobile that picked up the two men in the Holiday Apartment complex. She testified that although unaware of the purpose of the trip, she had accompanied her husband, Michael Glover, that morning. Michael met and talked with Rayford and Sublet at several different locations during approximately two hours preceding the robbery of the Laurel Bank. The Glovers then drove to a side street near the Holiday Apartment complex. Diana saw the blue and white Oldsmobile skid off the road and saw the two men run into the woods. Michael Glover drove the maroon Oldsmobile into the apartment complex. Diana Glover positively identified Kenneth Rayford and Ronald Sublet as the two men who got into the maroon Oldsmobile.

The Glovers took Rayford and Sublet to the William Poole residence. They entered the house by separate doors. Poole testified that they looked tired and that the two, along with Michael Glover, watched a televised news account of the robbery with interest.

That afternoon Diana and another woman, Marlene Fue, were instructed by either Sublet or Rayford to return to the woods near the Holiday Apartment. Presumably they were to attempt to retrieve the money that had been dropped. Diana and Marlene used the orange Matador. Murphy and others had by this time told police that an orange Matador had accompanied the getaway car. When the Matador was spotted in the area of the Holiday Apartments, it was stopped and both Diana and Marlene were arrested. Diana led the police to the Poole residence where, early the next morning, Rayford and Sublet were captured.

Kenneth Rayford pled guilty to the bank robbery charge and was sentenced to twenty-five years.

## II. ISSUES

### A. *Jury Threat*

The most troublesome question presented by appellant Sublet concerns an alleged

"threat" made to an alternate juror during the trial. Although the exact nature of the incident is in dispute, the following facts are clear. Alternate juror DeMaria was leaving the courthouse on the first day of trial, a Monday, when she was passed by two black persons, a man and a woman, whom she recognized as spectators of the trial. DeMaria heard the black woman say, "You better make the right decision." The juror testified at a later *in camera* hearing that she thought the statement was directed to her and that she did not think she had overheard a conversation between the black man and woman, but she was not certain.[2]

DeMaria did not report the comment. On the following Thursday, after the close of evidence and prior to closing arguments, the court became aware of the incident for the first time. On that day, DeMaria related the story during lunch to three non-alternate jurors: Coleman, Parker and Carr. Parker told the jury foreman, Coppage, who then notified one of the prosecutors. The court then interviewed the five jurors individually in his chambers on the record with counsel and the defendant present. There is nothing in the record to suggest that any other jurors were aware of the incident in question.

None of the jurors interviewed characterized the comment by the black woman as a threat. The four non-alternate jurors indicated that the comment had not been made directly to DeMaria and that she may have just overheard a conversation not connected to the trial. Juror Parker said that the comment "may not have been in connection with the trial." Juror Carr's version made the comment seem somewhat more significant. She said that DeMaria described the black woman as having a "very mean look on her face." On the record DeMaria described the woman as "tall, black and pretty."

Jurors Coleman, Parker and Carr, and alternate juror DeMaria all stated that their impartiality would not be affected by this incident. Foreman Coppage was not asked if it would have any effect on his view of the case. The district court adopted a special instruction drafted with the approval of defense counsel, without waiver of his motion for mistrial, to minimize any possible prejudice. The instruction stated:

> [I]t has come to the Court's attention that early in the week one of the jury members overheard a comment by a courtroom spectator in the lobby at the front of the Courthouse. The Court has been assured by those members of the jury who may have had some knowledge of the substance of the comment, that their impartiality would not in any way be affected by their knowledge of this remark.
>
> It is my duty now to simply repeat my previous instruction that only evidence in the courtroom is to be considered in arriving at your verdict in this case.
>
> \* \* \* \* \* \*
>
> [T]he out of Court comment to which I am referring, was of course not made by either party to this case, nor [was] the comment in any way attributed to any party in the case. Under no circumstances should this minor incident cause you to be distracted from your responsibility of deciding the case solely on the basis of the evidence presented during the course of this trial in this courtroom.

Alternate juror DeMaria did not take part in the deliberation of this case.

 It is well established that any private communication during a trial, directly or indirectly, with a juror about the matter pending before the jury is deemed presumptively prejudicial and the burden is upon the government to show that the contact was harmless. *Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). In this case the district court conducted a careful investigation in the presence of counsel and the defendant to

---

2. The government conceded at trial that the black woman who had made the comment in DeMaria's presence would likely be identified as one of defendant Sublet's sympathizers. The black woman had sat in the courtroom with a child who had been identified as defendant Sublet's son.

determine the nature of the private contact and its influence on the jury. Because DeMaria did not take part in the deliberations of this case, the impressions of the other members of the panel are likely more important than DeMaria's own account of the story. All four of the other jurors suggested that their understanding was that DeMaria may have overheard a conversation that was directed to someone else. None of the jurors expressed any fear or uneasiness about the incident.

■ The district court made the following comments when it overruled appellant's motion for a mistrial:

There would seem to be no way to prevent an occurrence of [an] incident of this sort or reoccurrence. * * * We are not at the point of closing the courtroom doors and the appearance of spectators conceivably does have an effect on members of the jury at times. And similarly, any spectator who gets carried away by the case or who is sufficiently connected emotionally with one side or the other, may say something out of line. And we are, in my view, going to have to rely on the jury having enough mental discipline to disregard things that they should disregard with proper instructions. I don't know how we can try cases without having that much confidence in the members of the jury.

We believe that the district court makes a salient point. Although regrettable, we do not believe that this single, isolated incident was sufficiently prejudicial to be incurable. The court carefully instructed the jury as a whole that any incident outside the courtroom should be disregarded. The comment made to DeMaria, as described by the other jurors, was not so unequivocal that it could be called a threat. Further, the combined

testimony of Duane Murphy, Diana Glover and William Poole constructed a strong case against the defendant. We conclude that it was not an abuse of discretion for the district court to deny the defendant's motion for mistrial.[3]

### B. *Lineup*

On the morning following the robbery, Duane Murphy, along with several other witnesses, viewed a lineup conducted by the Kansas City police. Murphy identified Rayford as one of the robbers but was unable to positively identify Sublet. According to Murphy's testimony at the suppression hearing, he thought he recognized Sublet but he was told by an officer that if he was not certain he should not claim an identification.

The lineup was conducted by Detective Lester Scott. Scott testified that he advised Sublet of his right to counsel but noted that Sublet refused to sign a waiver form. However, Sublet consented to being placed in the lineup after the purpose of the lineup was explained. Another suspect in the lineup, Kenneth Rayford, requested an attorney. The lineup was delayed for half-an-hour until Rayford's attorney arrived.

■ Appellant claims that his Sixth Amendment right to counsel was violated. The government argues that no formal complaint had been filed at the time the lineup occurred and, therefore, no Sixth Amendment right attached citing *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Without reaching the Sixth Amendment issue, we find that defendant Sublet waived any rights he may have had. He was clearly given the opportunity to have an attorney present. The fact that another suspect requested an at-

---

**3.** *Cf. United States v. Fleming*, 594 F.2d 598 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). In *Fleming*, the Seventh Circuit upheld a conviction where two members of the jury became frightened after being contacted by the brother of the defendant. The two jurors were also followed. Similarly to the case at bar, the two jurors told other members of the panel. In *Fleming*, the court relied upon the statements of the jurors

that the contact would not effect their decision. *United States v. Fleming, supra*, 594 F.2d at 601, 608. We note that the chance for prejudice was significantly less in the case at bar. In *Fleming*, the jurors had actually been frightened. Here alternate juror DeMaria was not even certain that the incident was important enough to report. *See also, United States v. Albert*, 595 F.2d 283 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

torney and the lineup was delayed until counsel arrived is strong evidence that Sublet was not denied his right to counsel.

A waiver need not be express but can be inferred from the actions and words of the defendant. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). The refusal to sign a waiver form is not dispositive and the issue must be decided from all the surrounding circumstances. *United States v. Mears*, 614 F.2d 1175, 1178 (8th Cir.), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980). Our examination of the circumstances reveals that Sublet waived any right to counsel he may have had.

We find the appellant's other two attacks on the lineup identification without merit. Sublet claims that the lineup was impermissibly suggestive and unreliable because of the clothes Sublet wore and because Murphy did not make his tentative identification until he had met with the prosecutors several times and reviewed the photographs of the lineup. However, as noted, Murphy attempted to make a tentative identification at the time of the lineup but was told to only record a positive identification. The appellant's contention that Murphy's tentative identification was somehow the product of his meetings with the prosecutor is unfounded.

Sublet wore yellow slacks or jogging pants in the lineup. He was the only one in the lineup with bright clothing. However, Murphy testified that his identification was based upon Sublet's build and facial features. He also said that Sublet was not wearing yellow pants when he first saw him immediately after the robbery. The photographs taken by the surveillance camera in the bank support Murphy's contention.

■ We find that defendant's due process rights were not violated under either theory.

■ Sublet also claims that the admission of Murphy's tentative identification violated Rule 403, Fed.R.Evid., because its probative value was far outweighed by the danger of unfair prejudice. We disagree. A tentative identification can be evaluated by a jury as well as any other evidence. It was clearly not an abuse of discretion to admit this testimony.

### C. Sufficiency of the Evidence

The appellant claims that the jury conviction was supported by insufficient evidence. He asserts that only Diana Glover's testimony placed him as one of the bank robbers. Sublet recognizes the rule that a conviction may be based upon the uncorroborated testimony of an accomplice if it is not otherwise incredible or unsubstantial on its face. *United States v. Haskins*, 536 F.2d 775, 779 (8th Cir.), *cert. denied*, 429 U.S. 898, 97 S.Ct. 263, 50 L.Ed.2d 182 (1976).

The appellant asserts that Diana Glover lied to protect her husband who actually was the second bank robber. Sublet points to a supposed inconsistency in Diana's story. He maintains that two of the three bystanders who saw the two robbers enter the maroon Oldsmobile in the Holiday Apartment complex stated that there was only one person in that car. This conflicts with Diana's story because she stated that she was in the car with her husband who was driving. We agree with the government that the record does not support this argument. At trial, two of three bystanders said there were two persons in the Oldsmobile, two said they were uncertain about the sex of the driver and a third bystander said the driver was a male.

■ This is the only inconsistency that the appellant is able to suggest. Because we find it is without merit, plus the fact that Diana's story is supported by the testimony of Duane Murphy and William Poole and is substantially corroborated by circumstantial evidence, we hold that the evidence was more than ample to support the jury conviction.

### D. Aiding and Abetting Instruction

■ The appellant contends that the use of an aiding and abetting instruction was improper where the prosecution proceeded

on the theory that the defendant was a principal. He argues that the jury may have convicted him based on his association with others who committed the robbery. We disagree. The district court used the aiding and abetting instruction because it was unclear whether both bank robbers had been armed while in the bank. The use of a dangerous weapon is an essential element of a prosecution under 18 U.S.C. § 2113(d). Without the aiding and abetting instruction, a conviction under section 2113(d) may have been improper. The photographs taken by the bank's surveillance camera indicate that only one of the robbers brandished a weapon while in the bank. We, therefore, hold that the instruction was proper.

Affirmed.